IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM CALVIN CARPENTER and      )
JAMES KEITH ROGERS,               )
                                  )
        Plaintiffs,               )
                                  )
v.                                )       CIVIL ACTION NO.  1:04cv1181-C
                                  )                (WO)
KELLEY FOODS OF ALABAMA, INC.,    )
                                  )
        Defendant.                )

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

Plaintiffs William Calvin Carpenter ("Carpenter") and James Keith Rogers ("Rogers")

bring this action against their employer, Kelley Foods of Alabama, Inc. ("Kelley Foods"),

alleging that they were wrongfully terminated on the basis of their race and subjected to a

racially hostile work environment.  They bring this action pursuant to 42 U.S.C. § 1981 and

42 U.S.C. § 1983.[1]  They seek compensatory and punitive damages, injunctive relief, and

attorney fees.  The court has jurisdiction over this matter pursuant to its federal question

jurisdiction, 42 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1,

the parties have consented to the United States Magistrate Judge conducting all proceedings

in this case and ordering the entry of final judgment.

---

[1]  The same prima facie elements are required to prove 42 U.S.C. § 1981 discrimination claim as are
required to prove Title VII discrimination claims. *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989);
*Brown v. American Honda Motor Co.,* 939 F.2d 946 (11th Cir. 1991).  Consequently, although the plaintiffs
do not present any Title VII discrimination claims, the court analyzes their claims against Kelley Foods
within the familiar Title VII analytical framework.

This action is now pending before the court on the defendant's motion for summary judgment. After careful review of the motion for summary judgment, the briefs filed in support of and in opposition to the motion, and the supporting and opposing evidentiary materials, the court concludes that the defendant's motion for summary judgment is due to be granted in part and denied in part.

## II. STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[2] The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

---

[2] In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the court stated:

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . .We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . .

*Id.* at 324.

fact." *Id.* at 323. The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324. If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also* FED. R. CIV. P. 56(e). ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); *Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995). However, if there is a

3

conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law FED. R. CIV. P. 56(c). With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

### III.  FACTS[3]

James Keith Rogers was hired by Kelley Foods as a truck driver in September 2000. William Calvin Carpenter was hired as an assistant shipping manager by Kelley Foods on July 29, 2002. (Carpenter Dep. at 44-45). At the time of Carpenter's employment, Kelley Foods was litigating a prior race discrimination action. (*Id*. at 82). Carpenter was promoted to shipping supervisor on June 8, 2003. (*Id*. at 46-47). He supervised the night shift. (*Id*. at 52-53). On August 24, 2003, Rogers was promoted to assistant shipping supervisor on the night shift based on the recommendation of Carpenter. Both men are black.

On the evening of March 11 and morning of March 12, 2004, Carpenter brought his personal laptop computer to work. (*Id*. at 53). On the computer was a video clip of "unclothed persons having – performing sexual acts." (*Id*.). It is undisputed that the video clip had sound. (*Id*. at 54). Carpenter showed the video clip to several subordinates. (*Id*.)

---

[3] On a motion for summary judgment the court must construe the facts in the light most favorable to the non-movants, the plaintiffs in this case. *See, e.g. Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990).

Carpenter explained his reason for showing the video clip as follows:

> Well, the night shift – the atmosphere that was there on the night shift was
> such that it was an atmosphere that they were – they accepted that type of stuff.
> That particular night and the atmosphere had been set.  All the guys had been
> talking about what they were going to do.  They were going to go out and find
> women, and it was – they were talking about getting pussy and this all night
> long and what they were going to do after the shift.  So it was set.  The
> atmosphere was just set, and it didn't appear to offend anyone.

(*Id*. at 57-58).

Carpenter did not deny showing the clip.  (Carpenter Dep. at 69-70).  He was

subsequently terminated for "violating company policy" because he showed the video clip.

(Carpenter Dep. at 77).  When Carpenter learned he was being terminated, he told  the

director of Human Resources, Erik Ennis, and the Warehouse Manager, Mike McDougald,

that if "they were terminating me they need to be fair across the board because that – this

thing was happening company wide" (*Id*. at 77).  Carpenter was terminated effective March

17, 2004.  (Carpenter Dep. at 80).

During the course of the investigation into Carpenter's showing of the video clip,

Ennis and McDougald asked Rogers if he knew about the clip.  (Rogers' Dep. at 66).  Rogers

admitted knowing about the video clip and seeing the laptop set up, but denied watching the

video clip.  (*Id*. at 68-69).  According to Rogers the video clip was not showing during the

time he was at the laptop.  (*Id*. at 69).  Ennis and McDougald subsequently watched a

surveillance tape from that evening and concluded that Rogers was the individual looking

at the laptop from 2:41:52 a.m. until 3:41:45 a.m.  As a result of their review of the

surveillance tape, Ennis and McDougald concluded that Rogers had lied about watching the video clip on the laptop.  Consequently, Rogers was terminated on March 18, 2004, for "not telling the truth during an investigation ."  (Rogers' Dep. at 82-83).

After Carpenter and Rogers were terminated, Ennis conducted an investigation into the sending of inappropriate emails containing sexual content.  As a result of that investigation, four white employees including McDougald were reprimanded for violating the company harassment policy.  None of the employees were terminated.

The plaintiffs filed this lawsuit on December 7, 2004, alleging a racially hostile work environment claim and a racial based termination claim in violation of 42 U.S.C. § 1981.

## IV.  DISCUSSION

### A.  Racially Hostile Work Environment

In support of their hostile work environment claim, Carpenter and Rogers complain about three statements made by Ronnie Culver that they assert demonstrates alleged racial animus.[4]  In the first statement, Carpenter complains that Culver told another employee Bob

---

[4]  The plaintiffs rely on evidence that employee Davie Sutherland was written up for using a racial slur on May 14, 2004, and for using the word "boy" on two separate occasions.  (Pl's Exs. 30 & 32).  They also rely on a January 21, 2005, reprimand of Randle Moore for making the statement that "Only white men are allowed in this restroom," and a January 21, 2005, reprimand of Scottie Farris for asking the question "Can't a white man get any help around here?"  (Pls' Exs. 33& 34).

These statements do not support their hostile work environment claim because none of these statements were directed at them, but more importantly, all four of these incidents occurred after both Carpenter and Rogers were terminated.  *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995) ("[S]ome of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment.").  Consequently, the plaintiffs cannot rely on these incidents to support their claim that they subjectively perceived their work environment as racially hostile.

6

Himes that Carpenter was "going to work [him] like a pulpwood nigger." (Carpenter Dep. at 88). After Rogers was hired as assistant shipping supervisor, Culver made the comment that "he was just too educated to work for two monkeys."[5] (*Id*. at 92). Lastly, Carpenter complains that Culver made the statement in Carpenter's presence that "Have you ever noticed that I'm the black plague around here?" (*Id*. at 96). Racially derogatory or demeaning comments have no place in the workplace or anywhere else.[6] However, the law clearly "prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Blevins v. Heilig-Meyers Corp.*, 52 F. Supp.2d 1337 (M.D. Ala. 1998) (citing *Hartsell v. Duplex Prods., Inc*., 123 F.3d 766, 773 (4th Cir. 1997)) *aff'd by* 184 F.3d 825 (11th Cir. 1999). *See also Carr v. Allison Gas Turbine Div., General Motors Corp*., 32 F.3d 1007, 1010 (7th Cir. 1994) ("Workers, like other people, often are foul-mouthed and . . . employers are not under a legal duty enforceable by suits under Title VII to purify the language of the workplace").

In this case, Carpenter and Rogers complain about three statements that were made during a two-year period while they worked in the warehouse, only one of which they heard

---

[5] Carpenter did not hear these two statements himself; Bob Himes informed him that Culver had made the remarks. (Carpenter's Dep. at 88 & 92).

[6] The statements at issue here are not direct evidence of racial discrimination by Kelley Foods. First, there is no evidence consistent with the requirements of FED. R. CIV. P. 56(e) of the statements. Two of these statements are hearsay which is insufficient because they are not based on the plaintiff's "personal knowledge." Secondly, stray, racially offense remarks in the workplace and statements by non-decision makers unrelated to the allegedly discriminatory action are not direct evidence of discrimination. *See*, *E.E.O.C. v. Alton Packaging Corp*., 901 F.2d 920, 923 (11th Cir. 1990). It is undisputed that Culver was not a decision-maker; rather, he was Carpenter's subordinate.

directly.  This is not a situation in which racial slurs and racially offensive material were so "commonplace, overt and denigrating" that a reasonable jury could conclude that "they created an atmosphere charged with racial hostility."  *Edwards v. Wallace Cmty Coll.*, 49 F.3d 1517, 1521-22 (11th Cir. 1995); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990).  Perhaps more importantly, however, neither Carpenter nor Rogers presents any evidence that these statements were directed to them personally.   In fact, Carpenter conceded during his deposition that he did not hear Culver make the racial slurs; he was told by Himes about the slurs.  (Carpenter's Dep. at 88 & 92).  The only statement Carpenter heard Culver make was his reference to "the black plague around here."  Consequently, the court is compelled to conclude, as a matter of law, that these egregious remarks do not constitute a per se racially hostile work environment.

The plaintiffs argue, however, that these statements, coupled with the scrutiny under which they worked, amalgamated into a racially hostile work environment.  Under the law of this circuit, a plaintiff establishes a prima facie case of racially hostile work environment harassment claim by showing:  (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment was been based on his race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatory abusive working environment; and (5) a basis for holding the defendant liable.  *See generally Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(*en banc*).

8

A plaintiff must establish that the harassment is sufficiently severe or pervasive "to ensure that courts and juries do not mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment'" and to ensure that the courts are not creating a "general civility code." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). To be successful, "a plaintiff must establish not only that []he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." *Gutpa*, 212 F.3d at 583. Finally, "[t]o constitute an actionable hostile environment, conduct must be objectively sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). It is the fourth element – conduct sufficiently severe or pervasive to alter the conditions of employment – "that tests the mettle of most . . . harassment claims." *Gupta,* 212 F.3d at 583. The court examines the conduct in combination, not isolation, to determine, under the totality of the circumstances, "whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Mendoza*, 195 F.3d at 1246 (citations omitted). *See also Johnson v. Booker T. Washington Broadcasting Serv., Inc.,* 234 F.3d 501 (11th Cir. 2000). This court considers four factors in determining whether the harassment objectively altered the terms or conditions of a plaintiff's employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3)

9

whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *See Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23).

Viewing the evidence in the light most favorable to the plaintiffs, the court concludes that Carpenter and Rogers have not established a prima-facie hostile work environment claim because the record contains no evidence that the conduct they were subjected to was sufficiently severe or pervasive to affect a term or condition of their employment and create a discriminatorily abusive work environment. Carpenter and Rogers complain about three statements that were made during a two-year period when they worked in the warehouse. The statements about which they complain were made by Culver, a non-decision-making subordinate. The plaintiffs present no evidence, other than the three statements coupled with their terminations, that they were subjected to racially hostile conduct. Applying the *Harris* factors to the totality of these events, the court concludes that the plaintiffs have failed to establish a genuine issue of material fact regarding whether the conduct at issue was objectively sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatory abusive working environment. Even if the court assumed that these three statements were sufficiently severe to satisfy the second element of either plaintiff's prima facie case, the infrequency of the conduct militates against a finding that three incidents during a two-year period were sufficiently pervasive to alter their  work environment. Neither plaintiff presents evidence that he was hindered in his ability to do his

job as a result of these statements.  Spread over a period of two years, the incidents are not at all frequent.[7]

The plaintiffs argue that because Carpenter and Rogers' actions were scrutinized more closely than other white employees and they were subsequently terminated, the totality of the circumstances clearly demonstrates that the plaintiffs were subjected to a racially hostile work environment.  The problem with the plaintiffs' argument is, however, that if the court accepts it, then every claim of racially discriminatory termination also becomes a hostile work environment claim.  This is not the law of this circuit and such a conclusion would severely weaken the severity requirements of present law.  Under the standards applied in this circuit, the three statements about which the plaintiffs complain fall under the rubric of offensive conduct which is outside the scope of Title VII.  *See e.g., Harris*, 510 U.S. at 22 (holding that "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently implicate Title VII.").  Accordingly, the court concludes that the plaintiffs have failed to establish that the alleged harassment was sufficiently severe or pervasive to alter the conditions of their employment and create a discriminatory abusive working environment.  Kelley Foods' motion for summary judgment on Carpenter and Rogers' racially hostile work environment claim is due to be granted.

### B.  Racial Discrimination Claims

Carpenter and Rogers both contend that they were subjected to a discriminatory

---

[7]  Even if the plaintiff were to show frequent conduct, "the frequency . . . does not compensate for the absence of the other factors."  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 (11th Cir. 1999).

termination based on their race in violation of 42 U.S.C. § 1981. Section 1981 prohibits

intentional discrimination on the basis of race in the making and enforcing of contracts,

including private employment contracts. *See Ferrill v. Parker Group, Inc.*, 168 F.3d 468,

472 (11ᵗʰ Cir. 1999). Section 1981 provides, in pertinent part:

> (a) All persons within the jurisdiction of the United States shall have the same
> right in every State . . . to make and enforce contracts, . . . and to the full and
> equal benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, . . .
>
> (b)  For purposes of this section, the term "make and enforce contracts"
> includes the making, performance, modification, and termination of contracts,
> and the enjoyment of all benefits, privileges, terms, and conditions of the
> contractual relationship.

42 U.S.C. § 1981. Thus,"[t]he test for intentional discrimination in suits under § 1981 is the

same as the formulation used in Title VII discriminatory treatment cases." *Id*.

The plaintiffs' claims are governed by the familiar tripartite framework established

by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  In an

employment discrimination case, the plaintiffs bear the ultimate burden of proving that the

defendant intentionally discriminated against them. *Burdine*, 450 U.S. at 253.  This Circuit

has consistently held that federal courts, in resolving discrimination claims, do not review

the accuracy of an employer's decision to terminate a plaintiff's employment. *See e.g., Jones

v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n.16 (11ᵗʰ Cir. 1998) (citing *Nix v.

WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11ᵗʰ Cir. 1984).  To be

successful, the plaintiffs must first prove, by a preponderance of the evidence, a prima facie case of discrimination. *Burdine,* 450 U.S. at 252-53. If the plaintiffs establish a prima facie case, Kelley Foods then has the burden of producing "some legitimate, non-discriminatory reason" for the challenged employment action. *See McDonnell Douglas,* 411 U.S. at 802. If Kelley Foods satisfies this burden, the plaintiffs must then prove, by a preponderance of the evidence, that the articulated reasons were mere pretext for intentional discrimination. *Burdine,* 450 U.S. at 256. In the summary judgment context, the plaintiffs need only present evidence from which a trier of fact could conclude the defendant intentionally discriminated against them.

To defeat the defendant's motion for summary judgment, Carpenter and Rogers must first establish a prima facie case of discrimination by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell-Douglas*, *supra*; or (3) presenting statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989).[8]

_____

[8] Direct evidence of employment discrimination consists of statements by a person with control over the employment decision "sufficient to prove discrimination without inference or presumption." *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993) (citing *Carter v. City of Miami,* 870 F.2d 578, 581-82 (11th Cir. 1989). The Eleventh Circuit has severely limited the type of language constituting direct evidence of discrimination. *See, e.g., Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997); *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393-94 n.7 (11th Cir. 1997); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990). This Circuit holds that a plaintiff presents direct evidence of discrimination where "actions or statements of an employer reflect a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997). Neither Carpenter nor Rogers argue that there exists direct evidence of intentional discrimination in this case, nor have they presented any statistical evidence supporting their claims of intentional discrimination.

Because Carpenter and Rogers have not presented direct evidence or statistical evidence of discrimination, the court proceeds to evaluate each plaintiff's circumstantial evidence of racial discrimination under the four-part *McDonnell-Douglas* test.

To establish a prima facie case of discriminatory discharge, the plaintiffs must show (1) that they are members of a protected class; (2) that they were qualified for the job from which they were discharged; (3) that they were discharged; and (4) that their former positions were filled by non-class members.   *See Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989); *Cf., Evans v. McClain of Ga.*, 131 F.3d 957, 964 (11th Cir. 1997); *Edwards,* 49 F.3d at 1521. It is undisputed that both plaintiffs are African-American; they were qualified for the jobs from which they were terminated; and that they were terminated.  In addition, it is undisputed that both plaintiffs were replaced by non-class members.  Carpenter was replaced by Bob Himes and Rogers was replaced by Chris King. (McDougald Dep. at 173-74).  Both Himes and King are white.  (*Id*.).  Consequently, the court concludes that the plaintiffs have established prima facie cases of discrimination.

Because the plaintiffs have established a prima facie case of discriminatory discharge, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for Carpenter and Rogers' terminations.  *McDonnell-Douglas*, 411 U.S. at 802 - 804.  Kelley Foods asserts that it terminated Carpenter, in accordance with company harassment policy, for showing his subordinates a pornographic video clip and because an employee complained about the video clip.  The Eleventh Circuit holds that "[t]o satisfy this intermediate burden,

14

the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Furthermore, in discharge cases, a violation of company policy, including a company's harassment policy, constitutes a legitimate reason for termination. See e.g., *Nix*, 738 F.2d at 1187. According to Kelley Foods, Rogers was terminated for lying during the investigation of the video clip. Although Rogers denied watching the video clip, Ennis and McDougald concluded that Rogers was lying because a surveillance video tape showed him looking at the laptop. Consequently, Kelley Foods has offered a legitimate, non-discriminatory reasons for terminating both Carpenter and Rogers.

At this juncture, to survive the motion for summary judgment, Carpenter and Rogers must present evidence creating a genuine issue of material fact on the issue of pretext. Carpenter and Rogers can create a jury question by demonstrating that Kelley Foods' legitimate, nondiscriminatory reasons should not be believed or by showing that in light of all the evidence, discriminatory reasons more likely motivated Kelley Foods' decision. *See Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). In evaluating a plaintiff's evidence of pretext, the court is not required to agree with the employer's proffered reasons for discharge. Instead, the crucial question is whether the employer was motivated by a racially discriminatory bias. *See e.g., Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) (citing *Combs*, 106 F.3d at 1538).

15

a.  Carpenter's Claim.  Carpenter asserts that Kelley Foods' reasons for terminating him were pretextual because no other white employees had ever been fired for a first offense policy violation, and other white employees were only reprimanded for sending sexually explicit and offensive e-mails which also contained partial nudity.  Carpenter also argues that Kelley Foods' assertion that they fired him because someone complained about the video clip should not be believed.  Carpenter can create a jury question by demonstrating that Kelley Foods' legitimate, nondiscriminatory reasons should not be believed or by showing that in light of all the evidence, discriminatory reasons more likely motivated the employment decision.  *See Mayfield*, 101 F.3d at 1376.

The court first addresses Carpenter's assertion that no other employee has been fired for a first offense violation of company policy.  It is undisputed that Kelley Foods has a sexual harassment policy which defines sexual harassment as including:

> Any unwelcome sexual advances, request or demands for sexual favors, verbal suggestive comments or verbal, written or electronically transmitted jokes of a sexual nature, sexual proposition, threats, continued or repeated verbal abuse of a sexual nature, (b) sexually suggestive objects or pictures, transmission of sexual or graphic material via e-mail or internet, physical, video, photo, computer or electronic display of sexual or graphic materials, graphic commentaries about an individual or his or her appearance, suggestive or insulting sounds, lewd whistling or obscene gestures. . .

(Ex. A, attached Ennis Aff., Doc. # 25)

By Kelley Foods' own characterization, Carpenter was fired because of his "display of the pornographic video . . . was not 'nearly identical' to the offenses of those reprimanded for sending inappropriate emails. . . ."  According to Kelley Foods, the content of the video

16

clip was much more severe than the emails because the video clip showed "unclothed persons . . . performing sexual acts" and contained sound.  It is clear from Kelley Foods' own policy on harassment that emails and video clips are equally prohibited under the policy. Consequently, the court concludes that a reasonable jury could not conclude from the mere fact that Carpenter's offense involved a video clip as opposed to an email that he was subjected to differential treatment.

In addition, Carpenter presented evidence that at least eight white employees received only reprimands after violating the company's harassment and discrimination policy.  These employees included Greg Mount, Mike McDougald, Daphne Young Colvin, and Ramona Wambles, all of whom were reprimanded for violating the policy by sending sexually oriented emails.  Davie Sutherland was reprimand twice for violating the policy but was not fired.   In addition, Ennis conceded that no other employee besides Carpenter has ever been fired by Kelley Foods for violating the harassment policy.   (Ennis Dep. at 82-83). Consequently, although Kelley Foods argues that other employees' offenses were less severe than Carpenter's, the court concludes that a genuine issue of material fact exists about Kelley Foods' reason for terminating Carpenter for violating the harassment policy should not be believed or that discriminatory reasons more likely motivated Kelley Foods' decision.

The plaintiff also relies on *Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449 (7th Cir. 1991), to argue that Kelley Foods' use of a subjective reason is a mask for discrimination.   However, in this circuit, a "subjective reason is a legally sufficient,

17

legitimate nondiscriminatory reason if a defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) (*en banc*).   While subjective reasons can be valid, the reasons must be capable of withstanding objective evaluation.  *Id*.

It is undisputed that Ennis and McDougald were the decision makers on Carpenter's termination.  Ennis did not see the video clip.  (Ennis' Dep. at 153).  There is no evidence that McDougald saw the clip either.  Thus, neither Ennis nor McDougald had a factual basis for their opinion that the clip was more severe than the emails.  Moreover, one of the decision makers about the degree of severity was McDougald who was himself involved in transmitting sexually oriented emails to others in the company.[9]  His involvement in the decision making process to terminate Carpenter based on the severity of the video clip creates a genuine issue of material fact about whether his subjective opinion has a factual basis and is legitimate.

Kelley Foods also claims that the showing of the video clip was much more severe than the sending of emails because the video clip was shown to subordinates.  However, when Ennis testified about the severity of Carpenter's conduct, he did not mention Carpenter showing the video to subordinates as a basis for determining Carpenter's conduct was more severe.  (Ennis' Dep. at 70).  In addition, Ennis admitted that people other than supervisors

---

[9] In deposition McDougald stated that he "did not consider [his] violation nor those of the remaining emails . . . to be remotely similar" to Carpenter's video clip. (McDougald's Aff.) McDougald's self-serving statement does more to create a genuine issue of fact about his objectivity or bias in the decision-making process than not.

got the emails.  (*Id*. at 94 and 136).  Thus, a genuine issue of material fact exists as to

whether the showing of the video clip to subordinates was pretext for terminating Carpenter.

Finally, Kelley Foods asserts that because Daniels complained about the video tape

and no one complained about the emails, the emails were not as severe as the video clip.  The

issue about whether someone complained about the video clip is, at best, equivocal.  Kelley

Foods describes Daniels' written statement as a complaint.  That statement, in its entirety,

is as follows:

> On the night of Thursday, March 11, 2004: Chris King, Shaun King and I were
> on the 14 aisle.  Calvin Carpenter walked up to us with a laptop computer and
> showed us a pornographic film.  After a minute, Calvin walked toward the
> receiving desk on the dry dock and showed it to several other employees and
> said it was to motivate us so we could hurry up and get home.  He had the film
> showing for what I thought was about 15 or 20 minutes.  I was either getting
> a new pallet or checking someone on the computer when he told me I needed
> to take it home and show it to my wife.

(Ex. C, attached Ennis Aff., Doc. # 25).

However, in deposition, Daniels testified that "he talked to someone about the video"

but that he did not complain about the video.  (Daniels' Dep. at 31).  Thus, an inference must

be drawn to arrive at the conclusion that Daniels complained about the video clip but that

nobody complained about the emails.  A reasonable jury could conclude that Daniels'

statement did not constitute a complaint.  Consequently, because the facts are such that

differing inferences can be drawn, summary judgment is not appropriate. *Frederick v. Sprint*

*United Mgmt. Co.*, 246 F.3d 1305, 1316-17 (11th Cir. 2001).

In order to show pretext, the plaintiff must "demonstrate that the proffered

> reason was not the true reason for the employment decision. . . . [The plaintiff]
> may succeed in this either directly by persuading the court that a
> discriminatory reason more likely motivated the employer or indirectly by
> showing that the employer's proffered explanation is unworthy of credence."
> *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089,
> 1095, 67 L.Ed.2d 207 (1981). "[A] plaintiff withstands summary adjudication
> by producing sufficient evidence to allow a reasonable finder of fact to
> conclude that the defendant's articulated reasons for its decision are not
> believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11ᵗʰ Cir. 1994) (citing
> *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d
> 407 (1993)). In evaluating a summary judgment motion, "[t]he district court
> must evaluate whether the plaintiff has demonstrated such weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions in the
> employer's proffered legitimate reasons for its actions that a reasonable
> factfinder could find them unworthy of credence." *Combs v. Plantation
> Patterns*, 106 F.3d 1519, 1538 (11ᵗʰ Cir. 1997) (internal citations omitted).

*Jackson v. State of Ala., State Tenure Comm.*, 405 F.3d 1276, 1289 (11ᵗʰ Cir. 2005). At the summary judgment stage, it is not necessary for Carpenter to prove that Kelley Foods' articulated reasons for terminating him are false; it is sufficient that a reasonable fact finder could conclude that Kelley Foods' reasons should not be believed. For these reasons, Kelley Foods' motion for summary judgment regarding Carpenter's termination is due to be denied.

b. Rogers' Claim. According to Kelley Foods, Rogers was terminated for lying during the investigation of the video clip. Although Rogers denied watching the video clip, Ennis and McDougald concluded that Rogers was lying because a surveillance video tape showed him looking at the laptop. Rogers asserts that Kelley Foods' reason for terminating him was pretextual because there was no evidence that he was lying. Whether or not Rogers was lying is immaterial. "It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center*

20

*v. Hicks*, 509 U.S. 502, 519 (1993)  Thus, Rogers' merely disputing that he watched the video is not evidence of pretext.

Rogers also asserts that because Ennis and McDougald gave inconsistent reasons for his termination, their reasons must be pretextual.  (Pls' Res. to Def's Mot. for Summ. J. at 57).

> The joint decision makers in Roger's (sic) termination McDougald and Ennis, gave differing testimony as to how and why they decided to terminate Rogers. McDougald testified that they decided Rogers had lied to them based upon watching a surveillance video that supposedly showed Rogers watching the pornographic clip in question.  (McDougald 238:10-15).  Ennis testified that they had decided that Rogers had lied to them based upon "talking with other witnesses."  (Ennis 253:21 - 254:5).

(*Id.*)

McDougald and Ennis' reasons for terminating Rogers are not inconsistent.  While they may have based their reasons for termination on different facts, their reasons for termination have remained consistent.  Both decision makers concluded that Rogers lied. There is no evidence to support a conclusion that either Ennis' or McDougald's views about what Rogers had done ever shifted.

However, Rogers can demonstrate pretext by presenting evidence that Kelley Foods "did not honestly believe" or that "no reasonable person in the exercise of impartial judgment" could have believed the facts upon which they relied to support their decision. *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265-66 (11th Cir. 2002).  Rogers contends that no reasonable jury could believe that he lied because no other employee stated that he

21

watched the video and the surveillance video was of such poor quality that no employee could possibly be identified.  The court concludes that there are genuine issues of material fact about whether a reasonable jury could believe the facts upon which Kelley Foods relied to terminate Rogers.  First, the only employee that reported seeing Rogers near the lap top was Chris Harrison who saw "a group of guys around the computer" including Rogers.  (Att. X. McDougald's Aff.).  However, Harrison also conceded in his statement that the computer was downstairs and not facing him.  (*Id.*)  No other employee saw Rogers watch the video; in fact, no other employee statement indicated that Rogers watched the video.  (Pls' Ex. 15 in Opp. to Mot. for Summ. J.)

Finally, Rogers argues that he was the victim of disparate treatment because he was terminated for lying while other employees were either not terminated or given multiple opportunities to tell the truth.  Rogers identifies two comparators: Mike McDougald and Jamie Nolan.  Rogers contends that McDougald was not terminated for lying to Ennis during his meeting with Ennis and Carpenter about the video clip.  According to Rogers, when McDougald told Ennis "he did not know what Carpenter was talking about," in reference to other incidents, McDougald lied because McDougald was sending sexually oriented emails. (Pls' Br. in Opp. to Mot. for Summ. J. at 61).

In order to survive summary judgment, "in addition to being a member of a protected class, [Rogers] must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and the

disciplinary measures enforced against him were more severe than those engaged in similar misconduct." *Jones*, 874 F.2d at 1540.  *See also, Jones v. Bessemer Carraway,* 137 F.3d 1306, 1311 n.6, *modified by,* 151 F.3d 1321 (11ᵗʰ Cir. 1998); *Walker v. Mortham*, 158 F.3d 1177, 1193 (11ᵗʰ Cir. 1998); *Holifield*, 115 F.3d at 1561.  The question of whether the plaintiff is similarly situated with non-minority employees is crucial.  *See Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1168 (11ᵗʰ Cir. 1988) (citing *Kendall v. Block*, 821 F.2d 1142 (5ᵗʰ Cir. 1987) (holding that Caucasian employees with a different grade level were not similarly situated with the plaintiff)).  It is Rogers' burden to prove that a similarly situated person not in the protected class received dissimilar treatment.  *See e.g., Holifield,* 115 F.3d at 1565.

The court concludes that Rogers has failed to demonstrate that he was similarly situated to McDougald.  Kelley Foods terminated Rogers for lying during an investigation into his conduct.  Even assuming McDougald did not tell the truth, his statement occurred during a meeting with Ennis and Carpenter about Carpenter's conduct.  McDougald was not the focus of any inquiry.

> In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. . . . We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.

*Maniccia v. Brown*, 171 F.3d 1364, 1368 (11ᵗʰ Cir. 1999) (citation and quotation omitted).

While McDougald's conduct was not admirable, it was not similar to Rogers.

23

Rogers also contends that he was similarly situated to Jamie Nolan. According to Rogers, he was fired immediately when Ennis and McDougald thought he was lying. Nolan, on the other hand, was suspected of leaving work before the end of his shift. After receiving complaints about Nolan, Ennis began an investigation. As a result of the investigation, Ennis confronted Nolan. Nolan was given several opportunities to admit that he had been leaving early. When Nolan did not, he was fired for lying. Nolan's termination letter is as follows:

> Last week we received complaints of you leaving work prior to the end of your shift. In investigating the complaints, it was revealed that the practice of leaving work excessively early has been ongoing for several months. The company understands that when a meeting is scheduled in the afternoon it may be necessary to leave an hour or two before the end of shift if the shift is running late. In reviewing the surveillance for May 8, 2003, the surveillance shows you left work at approximately 12:17 a.m. and did not return to the facility to complete the shift. This is clearly not allowed by any policy or condoned by the company in any manner. During the course of the investigation, it was also revealed that you were leaving work excessively early anywhere from one to two times per week. The investigation revealed that you would leave work typically around 9:00 - 9:30 pm and sometimes around midnight and not return for the remainder of the night.
>
> Last week I spoke and asked if you had been leaving early when I was not aware of your departure times. You stated that you had not left early unless I was aware of the date and time. This is in direct contradiction to what our investigation revealed. This has broken the trust and confidence I have in you to effectively lead your department. Therefore, you are being discharged from Kelley Foods of Alabama, Inc. effective immediately.

(Pls' Ex. 18 in Opp. to Mot. for Summ. J., Doc. # 34).

The fact that Nolan was given an opportunity to tell the truth instead of being fired immediately is not evidence of pretext. Differential treatment is based on the consequence, not the process leading up to the consequence. The fact that Nolan was not immediately fired

24

is of no consequence because Nolan was ultimately terminated.  Consequently, the court concludes that Rogers' arguments in opposition to summary judgment are insufficient to preclude summary judgment.

Nonetheless, argument of counsel is not evidence, and in totality, the court concludes that the evidence in this case is sufficient to defeat summary judgment with respect to Rogers.  First, it is undisputed that Rogers' was not previously disciplined or reprimanded during his employment with Kelley Foods; he was terminated for his first offense.  However, at least eight white employees had been disciplined but none were terminated for a first offense except Carpenter and Rogers.  Other white employees who received reprimands but were not terminated included Ronnie Culver, Scottie Farris, Randle Moore, Daphne Colvin, Rhett McCullough, Ramona Wambles and Curtis Gilbert.[10]  Although Ennis testified that Nolan was terminated for lying, an inference can be drawn that he was not terminated until Kelley Foods had evidence that he was leaving work early.  (*Compare* Ennis Dep. at 277-78 to Pls' Ex. 18 in Opp. to Mot. for Summ. J.).  In addition, Ennis conceded that no employee has ever been fired for a first time complaint of sexual harassment, or even after multiple complaints of racial harassment.  (Ennis Dep. at 83).  In fact, several white employees including Mike McDougald, continue to work at Kelley Foods despite receiving multiple written reprimands for inappropriate conduct or policy violations.  Except for Carpenter, no other employee has ever been fired for violating the harassment policy, and Carpenter was

---

[10]  Other employees also included Danny Edwards and Rex Jackson.  However, there is no evidence in the record regarding these employees' races.

fired for his first offense.  (*Id*. at 139).   Furthermore, Ennis admitted that he directed Carpenter to lower Rogers' evaluation for receiving a reprimand but did not lower any of the white employees' evaluations for receiving reprimands.  (*Id*. at 185-85 & 104).  When asked why he didn't lower evaluations for the other employees who received reprimands, Ennis replied "I didn't see a place for it to fit, I guess."  (*Id*. at 104).   Finally, Rogers testified that although Ennis suggested that he be reprimanded or suspended for one day, McDougald insisted that Rogers be fired.

> Q:     Was anything else said in that meeting?
> A:     And I stated to him at that time, I said, Mike, I was being truthful with you.  You asked me did I see any pornographic material, and I did not.  You know, I told you if I trying to deny it, I knew it was on the video camera, I wouldn't have told you where the camera was located at or the location it was in.  And that's when Erik tried to get, you know, Mike to hold off.  Let me go outside and they wanted to talk among each other for a minute.  But Mike didn't want to do it.  You know, he kept insisting, no, he got to go; he got to go. . . .

(Rogers' Dep. at 83).  The notes of this meeting also demonstrate that Ennis and McDougald were considering two white employees, Bob Himes and Chris King, as interim supervisors.  (Pls' Ex. 16 in Opp. to Mot. for Summ. J., Doc. # 34).  Interestingly, both Himes and King were selected to replace Carpenter and Rogers.  Finally, once Rogers was terminated, there were no longer any African-American supervisors at Kelley Foods.  The court concludes that the evidence of the extent of McDougald's involvement in both the investigations and terminations of Rogers and Carpenter, coupled with the fact that McDougald was himself involved in similar behavior and disciplined as a result of the investigations, is sufficient to

create a genuine issue of material fact about whether McDougald's reasons for terminating

Rogers were pretextual.

Taking all the evidence in the light most favorable to Rogers, a reasonable jury could

conclude that Kelley Foods' reason for terminating Rogers should not be believed.  At the

summary judgment stage, Rogers meets his burden if he can show "that there [is] a genuine

issue of material fact as to whether the reasons the [defendant] gave for his termination were

pretextual.  He [can do] this by pointing to evidence that created a genuine issue that the

reasons that the [defendant] gave were false or that a discriminatory reason was more likely

the cause of his termination." *Jackson*, at 1291.  Because the court concludes that there are

genuine issues of material fact about whether that Kelley Foods' legitimate,

nondiscriminatory reason for terminating Rogers should not be believed or that a

discriminatory reason was more likely the cause of his termination, Kelley Foods' motion for

summary judgment on Rogers' discriminatory termination claim is due to be denied.[11]  *See*

*Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996).

## V.  CONCLUSION

Accordingly, it is

ORDERED that the defendant's motion for summary judgment on the plaintiffs'

racially hostile work environment harassment claims be and is hereby GRANTED and these

---

[11]  The court pretermits discussion of Kelley Foods' argument that Carpenter would have been fired anyway, based on after-acquired evidence, because this is a matter of remedy and merely affects what relief, if any, may be granted.

claims be and are hereby DISMISSED with prejudice.  It is further

ORDERED that the defendant's motion for summary judgment on the plaintiffs' racially discriminatory termination claims be and is hereby DENIED.

Done this 2nd day of December, 2005.


        /s/Charles S. Coody

CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE